UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TERRY DAUM,                                          :

                  Petitioner,            :            **<u>MEMORANDUM DECISION</u>**

           - v -                                   :            17-CV-239 (DC)

STEWART T. ECKERT,                             :

                Respondent.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


APPEARANCES:            TERRY DAUM
                          Petitioner *Pro Se*
                          DIN 97-A-1295
                          Sullivan Correctional Facility
                          P.O. Box 116, Fallsburg, NY  12733

                          MICHAEL E. McMAHON, Esq.
                          Richmond County District Attorney
                          *By*:      Thomas B. Litsky, Esq.
                                Assistant District Attorney
                          130 Stuyvesant Place
                          Staten Island, NY  10301
                                Attorney for Respondent

CHIN, Circuit Judge:

        On February 3, 1997, following a jury trial, the Supreme Court of the State

of New York, Richmond County, entered judgment convicting petitioner Terry Daum

of four counts of robbery in the first degree, in violation of N.Y. Penal Law § 160.15(4),

and four counts of robbery in the second degree, in violation of N.Y. Penal Law

§ 160.10(1). Daum was sentenced to an aggregate prison term of forty-five years on the eight counts, which related to three armed robberies of all-night delis on Staten Island that took place in October and November 1995.

On January 17, 2017, proceeding *pro se*, Daum petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition").[1]  Proceedings were stayed to permit Daum to exhaust his state court remedies.  On March 9, 2022, after the Richmond County Supreme Court denied Daum's motion for post-conviction relief and the Second Department denied leave to appeal, this Court lifted the stay.  Daum and respondent Stewart T. Eckert filed updated papers.  Dkt. 84, 86.

Daum principally argues that evidence obtained by a private investigator whom Daum retained in 2014 proves that the People unconstitutionally deprived him of access to information relating to a witness who did not testify at trial, in violation of Daum's rights to due process.  Dkt. 86 at 1, 10-11; *see also Brady v. Maryland*, 373 U.S. 83, 86 (1963).  Daum also contends the investigator's findings show that witnesses and police officers testified falsely at trial and that the police conducted unduly suggestive lineup identifications.  Dkt. 86 at 1, 6.

---

[1]     Although Daum had counsel in the Richmond County Supreme Court when he filed his motion for relief under N.Y. Crim. Proc. Law § 440, he has proceeded *pro se* in federal court.  I therefore construe the Petition and supplemental materials liberally.  *See Johnson v. Fogg*, 653 F.2d 750, 753 (2d Cir. 1981).

This case was reassigned to me on January 17, 2023.  For the reasons set forth below, the Petition is denied in part and dismissed in part.

*STATEMENT OF THE CASE*

As the evidence at trial showed, in October and November 1995, Daum and two other individuals robbed three Staten Island delis at gunpoint.  First, on October 22, they robbed My Deli.  Seven days later, on October 29, they robbed the Twenty-Four Hour Deli.  Four days after that, on November 3, they robbed the Bipps Deli.  Daum was charged by indictment with seven counts of robbery in the first degree and nine counts of robbery in the second degree.  *See* App'x at 62-68.[2]

**A.    *Pre-Trial Proceedings***

Prior to trial, Daum challenged the photo arrays and lineups shown to eyewitnesses to the robberies who identified him.   On September 9, 1996, the trial court conducted a hearing pursuant to *United States v. Wade*, 388 U.S. 218 (1967).  Daum argued that the other individuals represented in the arrays and lineups did not sufficiently resemble him and that the People failed to indicate how many identification procedures did not produce positive identifications.  Hr'g Ct. Tr. at 30-33.

---

[2]      References are as follows: "Hr'g Ct. Tr." to the transcript of the *Wade* hearing of September 9, 1996, Dkt. 13-9; "Trial Tr." to the transcript of the trial before the Supreme Court, Richmond County, beginning January 15, 1997, Dkt. 13-18 through -23; "Pet." to the Petition, Dkt. 1; "Decl. in Opp'n to Pet." to the declaration in opposition to the Petition dated July 14, 2022, Dkt. 84; "App'x" to the supplemental state court record (which includes the Decision and Order of the Supreme Court, Richmond County, dated November 14, 2021), Dkt. 84-2; and "Pet. Supp." to petitioner's supplement and reply, Dkt. 86.

Police Officer Peter Battista testified at the hearing about the witness interviews and identification procedures he had undertaken.  On October 25, 1995, Battista spoke with Nicholas Saavedra, a witness to the My Deli robbery on October 22.  *See* Hr'g Ct. Tr. at 21.  Saavedra provided some description of the three perpetrators but, as Battista wrote in his notes, stated that he was "unable to ID perps and is not willing to view photos."  Decl. in Opp'n to Pet. at 4; *see also* Trial Tr. at 251-53.[3]  After interviewing Saavedra and others, Battista created a photo array, out of which four witnesses -- Shazad Sohail,[4] Silvester Orea, Mohamed Sulman, and Rafael Zeas -- identified Daum.  *See* Hr'g Ct. Tr. at 26-27.  On cross-examination, Battista acknowledged that other witnesses failed to identify Daum when shown his picture as part of the array.  *See id.* at 27.  Battista also testified that three lineups were held.  *See id.* at 13-16.  Orea and Zeas again identified Daum as one of the perpetrators.  *See id.* Sohail, for his part, initially stated that he did not recognize any of the lineup participants; subsequently, however, Sohail told Battista and a police detective that he

---

[3]   The DD5 is not part of the record before this Court, although it is quoted in the People's declaration in opposition to the Petition.  *See* Decl. in Opp'n to Pet. at 4; *see also* App'x at 74 (state court describing contents of DD5)..

[4]   Sohail's name is spelled differently in various documents before the Court.  Daum's private investigator, John Olivieri, used the alternative forms "Syed Soheil," "Sohil," and "Shoil."  *See* Pet. Ex. D.  Sohail's sworn statement of November 10, 2014, has the name "Syed Shahzad" written at the top of the page.  *See* Pet. Ex. E.  Because the contents of all these documents clearly pertain to Sohail, I construe them accordingly.

recognized Daum's face, although his hair was different.  *See id.* at 14, 26; *see also* Trial

Tr. at 674-75.

        The court found the identification procedures were not unduly suggestive

and denied Daum's motion to suppress the identifications.  *See* Hr'g Ct. Tr. at 33-38.

        During discovery, the People produced police reports related to the

robberies, including the "DD5" report prepared by Battista following his interview with

Saavedra.[5]  Discovery materials also included, *inter alia,* sheets from the lineups; grand

jury minutes from Battista and Sohail, Orea, Sulman, and Zeas; and police reports.  *See*

Trial Tr. at 251-53.  The People did not disclose the names and addresses of two

witnesses, Mr. and Mrs. Patel, who were the owners of the Twenty-Four Hour Deli and

whom Battista interviewed.  When shown the photo array, Mr. Patel did not identify

Daum, and by the time of trial, the People were unable to locate either Mr. or Mrs. Patel.

*See id.* at 248-50.  The court ruled that the defense could ask Battista about Mr. Patel's

non-identification, stating that it would permit what would otherwise be hearsay

testimony because "to some extent the People violated their obligation under *Brady*

---

[5]     Daum argues his counsel received this DD5 only after the prosecutor represented to the
trial court that Saavedra was unavailable.  *See* Pet. Supp. at 3-4.  Although Daum may be correct
that the People did not produce the report at his arraignment or during the *Wade* hearing, he
has brought forward no evidence that the DD5 was not produced "[i]n discovery," as the People
represented both at trial, *see* Trial Tr. at 251-53, and in response to the Petition, *see* Decl. in
Opp'n to Pet. at 4.

because the failure of a witness to identify the defendant is something that has to be disclosed to the defense." *Id.* at 248.

**B.**   *The Trial*

At the outset of the trial, the People dismissed eight counts of the indictment to streamline the jury's consideration of the case. *See* Tr. of Proceedings January 13, 1997, at 8-12.[6] The People's evidence at trial included five witnesses and two exhibits. Sohail, an employee of My Deli, testified as a witness to the robbery of that store; he identified Daum in court as one of the perpetrators and testified that he had seen Daum both on a surveillance camera feed and in person. Sohail also testified to his identification of Daum in the lineup. *See* Trial Tr. at 287-88, 293-94, 298, 305-07. Zeas, who was working at the Twenty-Four Hour Deli when it was robbed, testified that he saw Daum enter the store with two other men. Zeas identified Daum in court, testified that Daum was also the man depicted on video taken from the store's surveillance camera, and also recounted that he picked Daum out of the lineup. *See id.* at 389-91, 392-94. Orea, who was working at the Bipps Deli at the time it was robbed, likewise identified Daum in court, testifying that he recognized him from the robbery and the lineup. *See id.* at 512-13, 517-18, 523, 526-27. A fourth witness, Oma Deonarine,

---

[6]     The eight counts that remained comprised four counts of robbery in the first degree and four counts of robbery in the second degree. Although only three delis were robbed, the indictment charged in a separate set of counts that Daum had also taken money from Zeas's wallet. *See id.* at 9-10.

testified that she knew Daum through a mutual friend and saw him several times in the year before the robberies. *See id.* at 573, 575. She identified Daum in court as the person who appeared in a still photo taken from the Twenty-Four Hour Deli's surveillance footage. *See id.* at 578-80. Finally, Battista testified about his investigation of the robberies, including his interviews of witnesses, the photo arrays, and the lineups. Saavedra did not testify, nor did Mr. or Mrs. Patel. The defense did not put on a case.

The jury found Daum guilty on all eight remaining counts: four counts of first-degree robbery and four counts of second-degree robbery. *See id.* at 865-67. On February 3, 1997, the trial court sentenced Daum, as a second-time felony offender, to an aggregate term of forty-five years' imprisonment. *See* Dkt. 13-24.

C.    *Daum's Direct Appeal*

Daum appealed his convictions to the Appellate Division, Second Department. He challenged the convictions on numerous grounds, including that he was purportedly not present for several side-bar discussions with prospective jurors, the trial court improperly admitted Deonarine's testimony, the trial court erred in granting the People's motion to amend the indictment to substitute one deli employee's name for another, and the sentence was unduly harsh. *See* Decl. in Opp'n to Pet. at 12.

On December 26, 2000, the Appellate Division rejected all these claims on the merits, and on February 5, 2001, the Court of Appeals denied leave to appeal. *People*

*v. Daum,* 278 A.D.2d 505 (2d Dep't 2000), *lv. denied,* 96 N.Y.2d 757 (2001) (Smith, J.).  *See*

Decl. in Opp'n to Pet. at 12.

**D.    *Daum's Previous Applications for Post-Conviction Relief***

This is Daum's eighteenth application for post-conviction relief, in

addition to his direct appeal.  He has filed eleven *pro se* motions under N.Y. Crim. Proc.

Law § 440 claiming various errors on the part of his trial counsel, the People, and the

trial court.  All these motions were denied.  *See* App'x at 62-63; Decl. in Opp'n to Pet. at

12-13.  He has also filed three *pro se* applications for a writ of error *coram nobis,* alleging

ineffective assistance on the part of his appellate counsel; these too were denied.  *See id.*

The Court of Appeals denied leave to appeal all these motions and applications.  *See id.*

Finally, Daum has sought federal habeas relief on three previous occasions.  *See Daum v.*

*Ricks,* No. 01-cv-6520 (petition denied April 4, 2005); *Daum v. Ercole,* No. 08-cv-99

(petition dismissed as time-barred March 20, 2008); *Daum v. LaValley,* No. 13-cv-3730

(motion to authorize this Court to consider a successive habeas petition denied by the

Second Circuit December 10, 2013); *see also* App'x at 63.

**E.    *The Petition***

On October 18, 2016, Daum moved *pro se* in the Second Circuit for leave to

file a successive petition for a writ of habeas corpus, arguing primarily that the People

committed a *Brady* violation by not disclosing that Saavedra had not identified Daum

from a photo array.  In his motion, Daum indicated that he had obtained new evidence

after hiring a private investigator, John Olivieri, in 2014.  *Daum v. LaValley*, No. 16-3236

(2d Cir. Oct. 18, 2016), Dkt. 16 at 2-4.  Olivieri interviewed Saavedra, Sohail, and Zeas,

each of whom told Olivieri details about the robberies or their interactions with the

police that purportedly differed from their statements leading up to and at Daum's trial.

*See id.* at 7-14.

On November 16, 2016, the Second Circuit granted Daum's motion in part.

Dkt. 6.  The Circuit's order concluded with this direction:  "Although our ruling as to

the above *Brady* claim allows the entire petition to be filed, the district court is to

dismiss any other claim presented in the petition unless Petitioner shows that such

other claim satisfies the requirements of [28 U.S.C.] § 2244(b)."  *Id.* (also citing 28 U.S.C.

§ 2244(b)(4)).

Daum filed the Petition on January 17, 2017.  Dkt. 1.  Daum appended to

the Petition a collection of documents, including sworn statements from Saavedra and

Sohail affirming what they had told Olivieri, as well as a sworn statement from Olivieri

concerning his conversation with Zeas.  *See id.* Exs. B, E, G.

This Court stayed proceedings pending exhaustion of Daum's state

remedies.  Dkt. 15.  On May 2, 2018, with the assistance of counsel, Daum filed a motion

pursuant to N.Y. Crim. Proc. Law § 440.10, in the Supreme Court, Richmond County.

*See* App'x at 1.  The motion focused on the information Olivieri had received from

Saavedra.  Daum argued that (1) the People never disclosed that Saavedra had been

shown a photo array but did not identify Daum; (2) the People never disclosed two other failed photo array identifications from deli employees; and (3) Battista incorrectly testified at trial that Saavedra was not available because he had moved. *See id.* at 11-16. The court denied Daum's motion in its entirety, concluding that Daum had not met New York's standard for a new trial on the grounds of newly discovered evidence and that Daum had failed to establish a *Brady* violation. *See id.* at 71-76, 76-81.

The parties subsequently updated their papers in this Court. Dkt. 84, 86. The case was reassigned to me on January 17, 2023.

## DISCUSSION

### I.   *Federal Review of State Convictions*

A federal court may not grant a habeas petition where the petitioner is in custody pursuant to a judgment of a state court unless the petitioner "has exhausted the remedies available in the courts of the State" or such process is unavailable or ineffective. 28 U.S.C. § 2254(b)(1)(A); *see id.* § 2254(b)(1)(B); *Jackson v. Conway*, 763.F.3d 115, 133 (2d Cir. 2014) ("a state prisoner is required to exhaust all of his available state remedies before a federal court can consider his habeas application").

Moreover, a federal court may not grant a habeas petition with regard to a claim that was adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017); *Harrington v. Richter*, 562 U.S. 86, 97-98 (2011).  Hence, when a claim is adjudicated on the merits, the state court's decision must be accorded "substantial deference."  *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015).  "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'"  *Vega v. Walsh,* 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting *Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012).

Federal law sets an even higher standard when a petitioner brings a second or successive petition for habeas corpus presenting claims not contained in the petitioner's prior application.  In such a case, either the petitioner must "show[] that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or the petitioner must make two other showings:

(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(A), (B).  *See, e.g., Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) (stressing section 2244(b)(2)(B)'s requirement that facts underlying the claim be proven by clear and convincing evidence).

Finally, "federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (citation omitted).  Federal courts may not review a state court ruling that "fairly appear[s] to rest primarily on state procedural law," so long as the procedural bar is "adequate to support the judgment." *Murden v. Artuz*, 497 F.3d 178, 191-92 (2d Cir. 2007) (citations omitted).  Federal courts in this Circuit have repeatedly held that the gatekeeping provisions of New York laws governing the effect of a petitioner's failure to raise a claim on direct appeal "represent[] the application of a 'firmly established and regularly followed' New York rule." *Williams v. Goord*, 277 F. Supp. 2d 309, 318-19 (S.D.N.Y. 2003) (citations omitted).

## II.    *Analysis*

Construed liberally, the Petition raises three claims:  (1) the People failed to disclose *Brady* material related to interactions between the police and Saavedra; (2) Daum's conviction rests on false testimony from Battista and Sohail, and to the extent the People did not disclose evidence contradicting their testimony, that too was a *Brady* violation; and (3) the lineup identification procedures in which Sohail and Zeas

participated were tainted in a way that violated his due process rights.  Pet. at 7-14.[7]  As

noted above, the Second Circuit's mandate granting Daum leave to file a successive

petition for a writ of habeas corpus limited this Court's review to Daum's claim of a

*Brady* violation involving Saavedra, unless Daum demonstrated his other claims

satisfied the standard set forth in 28 U.S.C. § 2244(b).  Dkt. 6.

      I begin by considering the claim the Second Circuit has expressly granted

Daum leave to present.  I then address Daum's additional claims.

## A.    *The Alleged* Brady *Violation*

      Daum contends that the People failed to disclose that Saavedra had not

identified him out of a photo array; Daum claims he did not learn of this fact until his

investigator spoke to Saavedra in 2014.  The failure to disclose the information, he

contends, constitutes a *Brady* violation.  Pet. at 8.  In its cases applying *Brady*, the

Supreme Court has held that for a defendant to show that constitutional standards of

---

[7]    Daum's supplemental filing adds claims not raised in the Petition.  He argues, *inter alia*, that the police and prosecutors intimidated Zeas and threatened him with prosecution; the police told Deonarine, another trial witness, that her child would be removed from her if she did not testify against Daum; the police and prosecutors willfully permitted the destruction of evidence; the prosecutor improperly bolstered witness testimony; the prosecutor incorrectly represented to the court that other witnesses to the robberies, Syed Rashid and Hamin Syed, were unavailable; and the People presented hearsay testimony.  *See* Pet. Supp. at 15-22.  These claims are waived because they were not presented in the Petition.  *See* Rule 2(c)(1), Rules Governing Section 2254 Cases in the United States District Courts ("The petition must . . . specify all grounds for relief available to the petitioner.").  "A corollary of that principle is that an argument is not preserved by raising it in a reply."  *Windsor v. Patton*, 623 F. App'x 943, 947 (10th Cir. 2015); *see also Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).

due process were violated, the defendant must demonstrate that "[t]he evidence at issue

must be favorable to the accused, either because it is exculpatory, or because it is

impeaching; that evidence must have been suppressed by the State, either willfully or

inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82

(1999).  Prejudice for *Brady* purposes must be "so serious that there is a reasonable

probability that the suppressed evidence would have produced a different verdict." *Id.*

at 281.  The rule the Supreme Court enunciated in *Brady* is broad enough to

"encompass[] evidence known only to police investigators and not to the prosecutor."

*Id.* at 280-81 (internal quotation marks and citation omitted).

   In denying his § 440 motion, the state court held that Daum's *Brady* claim

fails on both procedural and substantive grounds.  The court cited two state-law

procedural bars.  App'x at 78.  First, section 440.30 of the New York Criminal Procedure

Law permits a court to deny a motion to vacate a judgment if "[a]n allegation of fact

essential to support the motion (i) is contradicted by a court record or other official

document . . . and (ii) under these and all the circumstances attending the case, there is

no reasonable possibility that such allegation is true." N.Y. Crim. Proc. Law

§ 440.30(4)(d).  Second, pursuant to section 440.10, a court *must* deny such a motion

where a defendant unjustifiably failed "to raise such ground or issue upon an appeal

actually perfected" when he could have done so based on the facts in the record, and a

court *may* deny such a motion where, in a prior motion, the defendant could have raised

"the ground or issue underlying the present motion but did not do so." *Id.* §

440.10(2)(c), (3)(c).

As to the first procedural bar, the court concluded that Daum's claim that

he was unaware Saavedra had failed to identify him was "completely contradicted by

the DD5, which is obviously an 'official document' and there can be 'no reasonable

possibility'" Daum did not know about the document's content.  App'x at 78.  Indeed,

the DD5 reported that Saavedra said that he could not identify the perpetrators and

refused to look at the photo array.  *Id*. at 75.  As to the second procedural bar, the court

noted that Daum had objected to the photo arrays in an earlier motion filed pursuant to

N.Y. Crim. Proc. Law § 440.  *See id*. at 78.  Because Daum knew that Saavedra had told

the police he could not identify the perpetrators, he could have raised this issue when

he made his earlier motions.

The court's analysis was certainly reasonable.  The DD5 indicating that

Saavedra did not identify Daum constitutes an official record that was not contradicted

by trial testimony or Saavedra's later affidavit.  The court was therefore justified in

concluding that the procedural bar of N.Y. Crim. Proc. Law § 440.30(4)(d) applied.  The

court's decision that Daum's claim was barred under the provisions of N.Y. Crim. Proc.

Law § 440.10 concerning the repeated presentation of claims for post-conviction relief

was also reasonable.  Both these state procedural rules are "independent of the federal

question and adequate to support the judgment." *Cone*, 556 U.S. at 465. This conclusion alone dooms Daum's *Brady* claim.

As to the merits, the court held that the People did not violate *Brady*. *See* App'x at 77-78. The court rejected Daum's argument that the trial court's comment that the People had "to some extent" violated *Brady* as to the Patels also established a *Brady* violation as to Saavedra. *Id.* The court distinguished two New York cases that Daum claimed stood for the proposition that a witness's failure to identify a defendant is always *Brady* material, even absent circumstances such as the recantation of a prior identification or the identification of a different person as the perpetrator. *See id.* at 76-79. Next, the court concluded that Saavedra's failure to identify Daum did not affect the positive identifications of other witnesses. *See id.* at 77-78. Finally, the court reiterated that because Daum received the DD5 in which Battista disclosed that Saavedra did not identify any of the perpetrators, Daum "was always aware that Mr. Saavedra could not identify the Defendant," even if the DD5 was inaccurate as to the identification method used. *See id.* at 78.

These reasons are compelling. Daum had access to Battista's DD5 concerning Saavedra; the fact that the People may have come close to violating *Brady* as to other witnesses proves nothing about the sufficiency of the disclosures concerning Saavedra; and there is no basis to infer that Saavedra's non-identification of Daum calls into question the affirmative identifications other witnesses made. The court's analysis

16

faithfully applies the criteria for a *Brady* violation that the Supreme Court set forth in

*Strickler*, 527 U.S. at 281-82. Although it is arguable that Saavedra's evidence may have

contradicted and thereby impeached Battista's testimony, Daum has at most established

only that the fact Saavedra had viewed a photo array was suppressed. Moreover,

Daum has not shown why there is a "reasonable probability" the disclosure of this fact

would have changed the jury's verdict. *Id.* at 281.

In sum, the state court's decision rejecting the *Brady* claim relied on an

independent and adequate state-law ground, did not involve an unreasonable

application of clearly established federal law, and did not result in a holding based on

an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1)-(2). Daum's

Petition is therefore denied as to his *Brady* claim.

**B.**     ***The Additional Claims***

As noted, the Second Circuit granted Daum leave to file a successive

habeas petition only as to the alleged *Brady* violation. The Circuit directed this Court to

dismiss all other claims in the Petition "unless Petitioner shows that such other claim

satisfies the requirements of § 2244(b)." Dkt. 6.

1.     *The Allegedly False Statements*

Daum's claim that Battista and Sohail testified falsely occupies an unusual

procedural posture. In denying the section 440 motion, the state court considered and

rejected Daum's allegation that Battista testified falsely about his interactions with

17

Saavedra as well as about Saavedra's unavailability as a trial witness.  *See* App'x at 69-
74.  The court also concluded that Daum's claim is procedurally barred under N.Y.
Crim. Proc. Law § 440.10(1)(g) because Daum gave no reason he could not have
obtained a sworn statement from Saavedra prior to filing any of his previous post-
conviction motions in state court.  *See id.* at 74.  The court did not, however, address
Daum's claim that Battista and Sohail testified falsely about Sohail's statements during
and after the lineup.

Although the state court addressed a portion of this claim, both
procedurally and on the merits, in accordance with the Second Circuit's mandate, this
Court must determine whether Daum has satisfied the demanding standard set by
section 2244(b).  *See Quezada v. Smith*, 624 F.3d 514, 521 (2d Cir. 2010) (describing
complementary roles of circuit, district, and state courts in habeas proceedings).  He has
not done so.

As an initial matter, Daum is not relying on a new rule of constitutional
law that the Supreme Court has made retroactive on collateral review.  *See* 28 U.S.C.
§ 2244(b)(2)(A).  He must, therefore, demonstrate both that he could not have
discovered the factual basis for his claim through due diligence and that the facts
underlying the claim "would be sufficient to establish by clear and convincing evidence
that . . . no reasonable factfinder" could still have found him guilty.  28 U.S.C.

§ 2244(b)(2)(B)(i)-(ii).  While due diligence is a close call, Daum is unable to show that no reasonable factfinder would have found him guilty even if his allegations are true.

As to due diligence, Daum alleges that he "was not in a position to track down newly discovered evidence . . . until recently.  In April of 2014, [he] received a settlement, involving a civil suit, which netted him nearly six thousand dollars, at which time he was then able to hire a private investigator."  Pet. at 3.  When Daum engaged Olivieri, more than seventeen years had elapsed since he was sentenced.  During this time, Daum was incarcerated and could not investigate his claims personally.  He was advised by counsel only on his direct appeal and in the state proceeding connected with the Petition.  Daum did not have counsel at the time he engaged Olivieri, nor at the time he filed the Petition.  *See* App'x at 24-35; Decl. in Opp'n to Pet. at 12-13.

Once Daum received the settlement funds, initially he moved quickly.  Olivieri interviewed Sohail on August 13, 2014, and again on September 23; Sohail signed his affidavit November 20.  *See* Pet. Exs. D-E.  Likewise, Olivieri interviewed Saavedra on August 18, 2014, and obtained his affidavit September 22.  *See* Pet. Exs. A-B.  Olivieri interviewed Zeas on October 14, 2014, and signed that day a sworn statement indicating that "[a]lthough Zeas did not sign an affidavit . . . Zeas advised me that, if he were called into court to testify, he would be willing to reveal what occurred"

during the lineup procedure in which he participated.  Pet. Ex. G ¶ 5.[8]  After this flurry of activity, however, two years elapsed before Daum moved, on October 18, 2016, for leave to file a successive habeas petition.  Daum does not account for this delay, but he was, of course, still incarcerated.

I need not decide whether Daum acted with due diligence, however, because Daum cannot meet the second prong of the standard set forth in section 2244(b)(2)(B).  It violates due process for a state to leave in place a conviction that prosecutors know rests on perjured testimony.  *See Sanders v. Sullivan*, 863 F.2d 218, 223-24 (2d Cir. 1988).  But not all testimony that turns out to be incorrect creates a constitutional claim:  Where a witness has recanted trial testimony, the Second Circuit has called for "careful scrutiny" of the recantation, noting that "traditionally [it] is 'looked upon with the utmost suspicion.'"  *Id*. at 225 (citation omitted).  "Only recantations of material testimony that would most likely affect the verdict rise to the level of a due process violation."  *Id*.  The Circuit has observed that section 2244 imposes an even higher standard:  It is not sufficient that the outcome of the trial would "most likely" have been different absent the perjured testimony.  *See Quezada*, 624 F.3d at 522.  Instead, the standard is whether without the testimony no reasonable jury could have found the petitioner guilty.  *Id.*

---

[8]    Although Daum's arguments as to Deonarine are waived, *see supra* n.7, Olivieri interviewed her as well, on August 22, 2014.  Pet. Supp. Ex. A.

Daum contends that Battista testified falsely about (1) Saavedra's availability to testify at trial, (2) the number of times Battista spoke with Saavedra, and (3) Saavedra's characterization of the perpetrators he saw.  Daum also contends that Battista and Sohail testified falsely about the lineup in which Sohail participated.  Battista has not disavowed his trial testimony, and Sohail has done so only by implication.  Moreover, Sohail's trial testimony is generally, although not entirely, consistent with the statements he gave to Daum's investigator.  Although Daum speculates in the Petition that the People acted in bad faith, *see e.g.*, Pet. at 8, he has brought forward no evidence that any testimony was deliberately falsified.  I review each of Daum's allegations in turn.

As to Daum's first allegation, it is true that Saavedra's 2014 affidavit contradicts Battista's testimony at trial. *Compare* Trial Tr. at 614 (Battista testifying Saavedra had moved) *with* Pet. Ex. B at 2 ("from the time of the robbery I live [*sic*] in the same location on Staten Island").  As the state court observed, however, "there is no requirement that the People obtain testimony from any certain witness."  App'x at 71. Assuming Saavedra never moved, Daum could have located him before trial and called him as a witness.  Moreover, again assuming Saavedra did not move and therefore Battista's testimony was not true, Daum has not shown that no reasonable jury could not have found him guilty had the jury been aware that Battista testified falsely.

Next, Daum alleges Battista testified falsely about his interactions with Saavedra. Daum focuses on two of Battista's statements at trial. First, according to Daum, Battista testified falsely when he said he interviewed Saavedra on only one occasion. *See* Pet. at 7-8. But Saavedra's statement does not claim he was interviewed more than once. *See id.* Ex. B. Second, Saavedra told Battista the perpetrator who carried a gun was masked and "shorter than me (5' 5")," whereas Battista testified that Daum stood 5 feet 7 inches tall and weighed some 140 pounds at the time of his arrest. *Compare id.* Ex. B *with* Trial Tr. at 641.[9] But Battista never testified as to what Saavedra had told him about Daum's height and weight, only about the height and weight Daum himself reported.

Last, Daum alleges that Battista and Sohail testified falsely about what happened during the lineup. In Sohail's 2014 affidavit, he claims that after he failed to identify any participant in the lineup as the perpetrator, an officer asked him, "Which one looked the closest to the person that robbed your store?" Pet. Ex. E. Sohail claims he replied, "number 5 [where Daum was sitting] but his hair is different." *Id.* According to Sohail, "[t]his happened inside the room with the window that I looked through." *Id.* At trial, Sohail testified only that he recognized Daum in the lineup. *See*

---

[9]     The unsworn statement by Daum's investigator, Olivieri, reports that Saavedra recalled describing the armed robber as having been masked and "heavy set." Pet. Ex. A. But Saavedra's sworn statement does not mention anything about the perpetrator's weight. *See* Pet. Ex. B. *See also Haouari*, 510 F.3d at 353-34 (collecting cases holding that unsworn testimony does not constitute "evidence" within the meaning of section 2244).

Trial Tr. at 306-07.  Battista testified that Sohail "initially" was unable to identify anyone in the lineup but then, "when he left the lineup room itself he made a statement to Detective Eric Le[]rner, who I had been working with that night, who was not in the lineup room, that Number 5 was the face of the guy from the robbery, but his hair was different."  *Id.* at 674.  Battista continued:  "I escorted Mr. Sohail out to the front of the 70th Precinct, at which time he repeated that statement to myself."  *Id.* at 674-75.  Battista testified that, with a prosecutor's guidance, he filed a report indicating the result of Sohail's lineup was "negative," notwithstanding what Sohail said outside the lineup room.  *Id.* at 676-77.

Sohail's and Battista's testimony differs slightly from Sohail's 2014 affidavit.  Sohail did not disclose to the jury his hesitation in identifying Daum, but the jury nevertheless learned about his lack of certainty because it heard extensively from Battista about how the lineup in which Sohail participated had unfolded.  *See id.* at 674-76.  Strategically, on cross-examination, Daum's counsel drew the jury's attention to Sohail's having not initially picked Daum out of the lineup.  *See id*. at 669-70.  Counsel challenged how Battista had recorded the lineup's outcome, as well as drew out testimony that Battista had consulted with the prosecutor before making his record.  *See id.* at 676-78.  Because the jury had a full opportunity to weigh Sohail's credibility in light of Battista's testimony, it is not plausible that the jury -- let alone *any* reasonable

jury, as section 2244(b) requires -- would not have convicted Daum had Sohail testified with greater specificity.

As to Battista, the only discrepancies between his testimony and Sohail's affidavit are (1) whether an officer prompted Sohail to indicate which lineup participant most closely resembled the perpetrator and (2) whether Sohail made his follow-up statement about Daum's face and hair inside or outside the lineup room.  I discuss below whether the officer's purported prompting of Sohail was a constitutional violation that meets the standard of section 2244(b).  Here, I note that the specific location where Sohail made his follow-up statement is not material to the statement's content, even assuming Sohail's memory of this detail is accurate nearly two decades after the fact.  Again, there is no possibility any reasonable jury would have changed its verdict had Sohail's trial testimony on this point contradicted Battista's.

For these reasons, Daum cannot satisfy the requirements of section 2244(b) as to his claims about false testimony.  I therefore dismiss this portion of the Petition.[10]

---

[10]     Construed liberally, Daum's claim that Sohail and Battista testified falsely may also allege a *Brady* violation.  That is, Daum may be arguing that because Battista was aware of the true particulars of the lineup procedure in which Sohail participated, the People were under an obligation to learn and disclose those details prior to trial.  This argument, however, does not succeed any more than Daum's allegation of a *Brady* violation with regard to Saavedra.  Daum knew that Sohail's identification was initially hesitant: as discussed, both at the *Wade* hearing and on cross-examination, Battista testified that Sohail initially did not identify Daum out of the lineup.  *See* Hr'g Ct. Tr. at 14; Trial Tr. at 674-76.  The only differences between Sohail's 2014 affidavit and what the court and jury heard had to do with whether an officer prompted Sohail and whether Sohail was inside or outside the lineup room when he said that Daum's face, but not hair, resembled the perpetrator's.  For the reasons given above, these differences are not

2.    *The Allegedly Faulty Lineup Identification Procedures*

As with his claim about the witnesses' testimony, Daum's claim about the lineup identification procedures does not meet the high bar set by section 2244(b). Again, Daum does not claim he is relying on a new rule of constitutional law that the Supreme Court has made retroactive on collateral review. *See* 28 U.S.C. § 2244(b)(2)(A). And again, even assuming Daum exercised due diligence as discussed above, he cannot show that no reasonable factfinder would have found him guilty even if Sohail's and Zeas's allegations are true. *See id.* § 2244(b)(2)(B)(i)-(ii).

For the purpose of assessing this claim, I continue to take as true Sohail's allegations about the lineup. *See* Pet. Ex. E.  I also take as true Zeas's allegation that while he was waiting to view the lineup, "another person . . . came into the waiting room and stated that 'the person is in seat number 5,' referring to" Daum.  Pet. Ex. G.[11]

The lineups may not have been perfect.  But the Supreme Court has noted that "[u]nlike a warrantless search, a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest." *Manson v.*

---

substantial enough to give rise to a "reasonable probability" the jury's verdict would have been different had it known what Sohail now asserts were the particulars of the lineup procedure. *Strickler*, 527 U.S. at 281.

[11]    As a threshold matter, I note that Daum's claim about the lineup in which Zeas participated relies not on sworn testimony from Zeas but on hearsay evidence contained in the report and sworn statement of Daum's investigator, Olivieri.  *See* Pet. Ex. G.  I take Olivieri's account of Zeas's allegations to be true for purposes of the section 2244(b) analysis, however, because Olivieri states that Zeas would be willing to testify under oath.

*Braithwaite*, 432 U.S. 98, 113 n.13 (1977).  Nor does the use of such procedures

automatically result in the exclusion of evidence.  *See id.* at 113-14.  Instead, the Court

has instructed, "reliability is the linchpin" in admissibility determinations.  *Id.* at 114.

Courts are to look at factors including "the opportunity of the witness to view the

criminal at the time of the crime, the witness' degree of attention, the accuracy of his

prior description of the criminal, the level of certainty demonstrated at the

confrontation, and the time between the crime and the confrontation.  Against these

factors is to be weighed the corrupting effect of the suggestive identification itself."  *Id.*

      As to Sohail, Daum has not shown by clear and convincing evidence that

the lineup procedure was so suggestive as to outweigh the identification's indicia of

reliability.  Sohail observed Daum during the robbery, both by viewing his image live

on the deli's surveillance camera and by encountering him in person at a distance of

four to five feet.  *See* Trial Tr. at 297-99.  Sohail saw Daum's "full face," and Sohail's

attention was particularly concentrated because Daum was holding a gun and

threatening to shoot everyone in the deli.  *See id.* at 299-300.  At the lineup, the question

the officer allegedly asked -- "Which one looked the closest[?]" -- did not prejudice

Sohail toward any particular lineup participant.  Pet. Ex. E.  Moreover, as I have already

discussed, Sohail's affidavit does not contradict Battista's testimony that Sohail, after

being unable to make an identification during the lineup itself, subsequently told a

detective "who was not in the lineup room[] that Number 5 [Daum] was the face of the

guy from the robbery, but his hair was different." Trial Tr. at 674. For these reasons, I

am not persuaded that the trial court should have suppressed testimony about Sohail's

lineup identification; indeed, at the *Wade* hearing, the trial court expressly considered

many of these facts and found the lineup not suggestive. Hr'g Ct. Tr. at 37-38. It

follows that Daum cannot carry his burden under section 2244(b).

Daum's claim about the lineup in which Zeas participated is somewhat

more troubling. If the person who viewed the lineup immediately before Zeas

disclosed where that person believed Daum was sitting, Zeas's identification may have

been compromised. Again, however, there are extrinsic indicia of the identification's

reliability. First, during the robbery, Zeas was at very close quarters -- a distance of

three or four feet -- with the person he identified as Daum. *See* Trial Tr. at 371-72. Zeas

clearly saw Daum's face both at that time, *see id.* at 372, and again later, when one of the

other robbers threw Zeas to the ground, *see id.* at 374-75. As with Sohail, the presence of

a gun and the threat of violence focused Zeas's attention on the perpetrators. Second, at

trial the People introduced surveillance footage from the Twenty-Four Hour Deli, and

Zeas identified Daum from the footage as well as from his own recollection. *See id.* at

388-89, 390-91. Third, nearly four weeks prior to the lineup, Zeas also identified Daum

from the photo array that Battista showed him. *See id.* at 431-32.

These factors lead me to conclude that any improper suggestion about

Daum's position in the lineup did not so taint Zeas's identification as to make it

unreliable.  Moreover, Zeas has not claimed that the person who told him where the

perpetrator was sitting was a police officer or spoke at the behest of the police.  Daum's

allegation that the individual was an undercover police officer is entirely speculative.

*See* Pet. at 11.  In addition, if Zeas's lineup identification were inadmissible, the taint

would not extend to Zeas's prior identification of Daum from the photo array.  *See*

*Wade*, 388 U.S. at 240.  And even if it did, the People called a second witness, Deonarine,

who identified Daum from the deli's surveillance footage.  *See* Trial Tr. at 580.  Daum

has not, therefore, carried his burden of showing by clear and convincing evidence that

no reasonable factfinder could have convicted him were it not for the admission of

Zeas's lineup identification.

   For these reasons, I find that Daum's claims regarding lineup procedures

do not satisfy the requirements of section 2244(b).  These claims are therefore dismissed.

## CONCLUSION

   I conclude that Daum has failed to show any basis for relief under 28

U.S.C. § 2254.  Accordingly, and in keeping with the Second Circuit's mandate, his

habeas petition is denied as to his *Brady* claim and dismissed as to all his other claims.

Additionally, I decline to issue a certificate of appealability because Daum has not made

a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253.

Pursuant to 28 U.S.C. § 1915(a)(3), I certify that any appeal taken from this decision and

order would not be taken in good faith.

The Clerk of the Court shall enter judgment accordingly and close this case.  The Clerk shall also mail copies of this memorandum decision and the judgment to Daum at his last known address.

SO ORDERED.

Dated:        New York, New York
              February 1, 2023

                                                    _____
                                                    DENNY CHIN
                                                    United States Circuit Judge
                                                    Sitting by Designation